The document below is hereby signed.

Signed: June 12, 2009.



_____
S. Martin Teel, Jr.
United States Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In re<br><br>LINTON PROPERTIES, LLC, *et al.*,<br><br>           Debtors.<br>_____<br><br>MARC E. ALBERT, CHAPTER 7<br>TRUSTEE,<br><br>           Plaintiff,<br><br>      v.<br><br>CHESAPEAKE BANK & TRUST<br>COMPANY,<br><br>           Defendant. | Case No. 08-00095<br>(Chapter 7)<br><br>(Jointly Administered)<br><br><br><br><br>Adversary Proceeding No.<br>08-10032<br><br>For publication in West's<br>Bankruptcy Reporter |

<u>MEMORANDUM DECISION</u>

The Chapter 7 Trustee, Marc E. Albert ("trustee"), commenced this adversary proceeding to avoid garnishment liens and recover property subject to the liens.[1]  The proceeding is moot except

_____

[1]  The trustee brings this action under 11 U.S.C. § 544(b). The trustee's standing seems more directly provided for under § 544(a)(1).  Neither party has made any challenge to standing, and there appears no question here that standing is proper.

for the garnishment lien on Citibank accounts.   Defendant

Chesapeake Bank and Trust Company ("Chesapeake") filed a motion

for dismissal or summary judgment.   In accordance with the

following analysis, the court will deny Chesapeake's motion to

the extent that it asserts the trustee is barred by res judicata,

but the court will grant Chesapeake's motion to the extent it

asserts that the trustee is contractually barred from challenging

that lien, or asserts that the lien was valid as of the

commencement of the case.

I

Facts

The material facts are not in dispute.   In April 2005,

Ronald M. Linton and Nancy G. Linton (the "Lintons") borrowed

$2,807,000 from Chesapeake.   The loan was guaranteed by Linton

Properties, LLC ("Linton Properties.")   In November 2007,

Chesapeake declared the loan due and filed a complaint against

the Lintons and Linton Properties in the Circuit Court of Kent

County, Maryland.   That court entered a judgment against the

Lintons for the amount owed, including Chesapeake's attorneys'

fees.

Based upon that judgment, in mid-November, 2007, Chesapeake

served a writ of garnishment on financial institutions at which

the Lintons and Linton Properties held accounts, including

2

Citibank where the Lintons had bank accounts.[2]  Chesapeake, with
the prior permission of Citibank, served the writ on the Citibank
Service Center in San Antonio, Texas by overnight mail.  Citibank
responded to the writ of garnishment by filing an answer
(Garnishee's Confession of Assets of Property Other Than Wages)
dated November 28, 2007, reporting that it held bank accounts for
the Lintons, and containing no reservation or exception regarding
the service of the writ of garnishment.

On February 8, 2008, the Lintons and Linton Properties filed
voluntary Chapter 11 petitions.  On February 27, 2008, as
debtors-in-possession, the Lintons and Linton Properties filed
complaints seeking avoidance of the garnishment because it was
executed within 90 days before the filing of the bankruptcy
petition, and because the garnishment violated the bankruptcy
case's automatic stay.  (*See* Adv. Proc. Nos. 08-10003; 08-10004.)
On June 11, 2008, this court approved a Stipulation and Order
that dismissed those adversary proceedings with prejudice and
that contained language (discussed later) that Chesapeake asserts
bars the trustee, as successor to the Lintons, from challenging
the liens.

---

[2]  The trustee's complaint sought to avoid liens on accounts
held by both Citibank and PNC Bank.  However, the PNC accounts no
longer contain funds; any recovery efforts from those accounts
are moot.  Therefore, only the Citibank garnishment remains at
issue.

On August 7, 2008, the bankruptcy estate was converted to a Chapter 7 proceeding.  The trustee then commenced this adversary proceeding, seeking to avoid the lien on the basis that the garnishment is invalid because the service of the writ of garnishment on Citibank allegedly did not conform to the requirements of Maryland law.

## II

### Standard of Review

#### A

##### Motion to Dismiss

The purpose of a Fed. R. Civ. P. 12(b)(6) motion is "to test the legal sufficiency of the complaint."  *Kingman Park Civic Ass'n v. Williams*, 348 F.3d 1033, 1040 (D.C. Cir. 2003).  In deciding a motion to dismiss, although the court "must construe the allegations and facts in the complaint in the light most favorable to the plaintiff . . . ," *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 195 (D.D.C. 2002), the complaint must nevertheless plead "enough facts to state a claim to relief that is plausible on its face," *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 1974 (2007), and "the court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts set out in the complaint . . .. [nor must it] accept legal conclusions cast in the form of factual allegations." *Kowal v. MCI Communications Corp.*, 16 F.3d 1271,

1276 (D.C. Cir. 1994). In deciding a 12(b)(6) motion to dismiss, "the Court may only consider the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt*, 226 F. Supp. 2d at 196.

B

Summary Judgment

Summary judgment is appropriate if, assuming all reasonable inferences favorable to the nonmoving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The court will not grant summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Doe v. U.S. Postal Service*, 317 F.3d 339, 342 (D.C. Cir. 2003). Although a finder of fact at trial is permitted to draw inferences from the evidence, those inferences "must be reasonably probable, and based on more than speculation." *Rogers Corp. v. EPA*, 275 F.3d 1096, 1104 (D.C. Cir. 2002) (internal quotations and citations omitted). When the evidence allows for contradictory inferences, summary judgment is inappropriate. *Id.* (citing *Londrigan v. FBI*, 670 F.2d 1164, 1171 n.37 (D.C. Cir. 1981)).

5

The moving party bears the burden to show that the material facts are undisputed.  *See Celotex*, 477 U.S. at 322.  The nonmoving party, however, may not rest on mere allegations or denials, but must instead demonstrate the existence of specific facts that create a genuine issue for trial.  *See Liberty Lobby*, 477 U.S. at 256.

III

The trustee argues the garnishment liens on the Citibank accounts can be avoided because the service of the writ of garnishment upon which they are based did not meet the service requirements of Maryland law.  Chesapeake argues that the trustee is precluded from challenging the validity of the writ because (a) the Lintons and Linton Properties, as debtors in possession, agreed not to challenge the validity of Chesapeake's liens in the Stipulation and Order, and the trustee is bound by that; and (b) the Lintons and Linton Properties, as debtors in possession, dismissed their February 27, 2008 challenges of the writs with prejudice, pursuant to the Stipulation and Order, and the trustee is barred by res judicata from challenging it again. Alternatively, Chesapeake argues summary judgment should be granted because the service of the writ was not deficient so as to fail to establish jurisdiction.

A

Contractual Bar

Chesapeake argues that, because the Lintons agreed in the
June 11, 2008 Stipulation and Order not to challenge Chesapeake's
liens, the trustee is also precluded from doing so.  The trustee
first argues that he is not a proper successor in interest to the
Lintons when they were acting as debtors in possession for the
Stipulation and Order.  This court has already resolved that
issue, holding that the trustee is a successor in interest.  *See
In re Linton Properties, LLC*, --- B.R. ----, 2009 WL 113460
(Bankr. D.D.C. Jan. 16, 2009) (citing *Armstrong v. Norwest Bank,
Minneapolis, N.A.*, 964 F.2d 797, 801 (8th Cir. 1992)).

The trustee next argues that the Lintons agreed not to
challenge Chesapeake's liens *only* in their capacity as
individuals, not as debtors in possession.  Chesapeake argues the
Lintons were acting as debtors in possession throughout the
Stipulation and Order.  This issue requires interpretation of the
language of the Stipulation and Order.

The relevant provision in the Stipulation and Order reads:

The Bank will retain its lien in the property garnished from
the following entities in the Kent County, Maryland, Case
No. 14-C-07-007298. ("Kent County Action") Citibank,
Johnston, Lemon & Co., Inc., John Hancock Life Insurance
Company, and PNC Bank (collectively, the "Garnished Funds")
with the same validity and priority as the lien had at the
time the Debtors' bankruptcy cases were commenced, and *the
Lintons agree not to challenge the lien of the Bank*.  The
Lintons and Linton Properties dismiss with prejudice the
adversary proceedings shown in the above caption.

7

(Emphasis added.)

The Stipulation and Order reads: "[t]he Lintons and Linton Properties dismiss with prejudice the adversary proceedings . . ." The Lintons and Linton Properties must have been acting as debtors in possession when they dismissed their complaints with prejudice, because - having filed the complaints under the authority of debtors in possession - only by that authority could the Lintons and Linton Properties have dismissed them. Thus, the phrase "the Lintons and Linton Properties" refers to the debtors as debtors in possession, not just in their individual capacities, and similarly the term "the Lintons" must include a reference to the Lintons in that same capacity.[3]

Another section of the Stipulation and Dismissal reads: "the Lintons may keep and use that Debtor-in-Possession account. . ." Only as debtors in possession could the Lintons utilize that account, and thus the phrase "the Lintons" must be identifying them in their role as debtors in possession. Also, under 11 U.S.C. § 1101(1), a debtor in a chapter 11 case serves as a debtor in possession unless displaced from that capacity by the

_____

[3] The reference to only "the Lintons" as agreeing "not to challenge the lien of the Bank" might raise an issue as to whether *Linton Properties* was still free to challenge the liens on *Linton Properties'* accounts other than grounds asserted in the adversary proceeding that both "the Lintons and Linton Properties" agreed to dismiss with prejudice. But it does not raise any issue as to whether the Lintons, in both their individual and debtor in possession capacities, were agreeing "not to challenge the lien of the Bank."

8

appointment of a trustee.  A trustee had not yet been appointed when the Stipulation and Dismissal was approved by this court.

Normally, words or phrases in a document are to be given meaning such that they are consistently defined throughout the document.  *E.g. America First Inv. Corp. v. Goland*, 925 F.2d 1518, 1521 (D.C. Cir. 1991) (*citing 1010 Potomac Assocs. v. Grocery Mfrs. of America, Inc.*, 485 A.2d 199, 205 (D.C. 1984) and others).  Although there is one instance in the Stipulation and Dismissal which refers to "the Lintons" in an individual capacity,[4] the other references to "the Lintons" not only indicate, but require, that the phrase refer to them in their capacity as debtors in possession.  Most notably, other uses of "the Lintons" in the same section and even same paragraph dealing with the bank's lien refer to them in their capacity as debtors in possession.  (Stipulation and Consent Order, Docket Entry ("DE") No. 109, ¶¶ 6-7.)  The phrase "the Lintons" should be consistently interpreted throughout that section; therefore, the Lintons as debtors in possession agreed not to challenge the bank's lien.

---

[4]  In one provision, the parties agreed that "the Lintons shall receive the full exemptions allowed pursuant to the Bankruptcy Code," and agreed that Chesapeake would release a post-petition lien Chesapeake had been granted on the Lintons' exempt property.  (Stipulation and Consent Order, DE No. 109, ¶ 13.)  That reference to "the Lintons" is limited to them in their individual roles, and not as debtors in possession, because exempt property is not property of the estate over which the Lintons served as debtors in possession.

Nevertheless, argues the trustee, when analyzing a document, a court must give each word and phrase in the document meaning. Here, the trustee argues, if the phrase "the Lintons agree not to challenge the lien of the Bank" is interpreted as an agreement by the debtors in possession, thus precluding the trustee from challenging the lien, then the phrase "[t]he Bank will retain its lien . . . with the same validity and priority as the lien had at the time the Debtors' bankruptcy cases were commenced" (the "validity phrase") is rendered meaningless.  In contrast, argues the trustee, if the Lintons, only as individuals, waived their future right to challenge the lien, then the validity phrase clarifies that any future challenges and defenses must be based on the validity of the lien as it was at the filing of the bankruptcy, rather than based upon its validity as a product of the Lintons' agreement in the Stipulation and Order not to challenge the lien as individuals.  In essence, argues the trustee, the Lintons were not agreeing in the Stipulation and Order that the lien was valid, only that they would withdraw their challenge at that time as debtors in possession and would not challenge the lien in the future as individuals, in exchange for other concessions in the Stipulation and Order.

The proposition that a contract must be interpreted to give each part meaning is supported by District of Columbia law.  As stated in *1010 Potomac Assocs.*, 485 A.2d at 205:

> The writing must be interpreted as a whole, giving a reasonable, lawful, and effective meaning to all its terms. *Vicki Bagley Realty, Inc. v. Laufer*, 482 A.2d 359, at 366 (D.C. 1984); *Davis v. Davis*, 471 A.2d 1008, 1009 (D.C. 1984); *Restatement (Second) of Contracts* §§ 202(2), 203(a) (1981).

District of Columbia decisions, however, have not discussed the application of that principle in depth.  It is thus appropriate to examine closely the *Restatement (Second) of Contracts* § 203 (1981), which was relied upon in *1010 Potomac Associates* and which provides:

> In the interpretation of a promise or agreement or a term thereof, the following standards of preference are **generally** applicable:
>
>     (a) an interpretation which gives a reasonable, lawful, and effective meaning to all the terms is preferred to an interpretation which leaves a part unreasonable, unlawful, or of no effect;
>
>     (b) express terms are given greater weight than course of performance, course of dealing, and usage of trade, course of performance is given greater weight than course of dealing or usage of trade, and course of dealing is given greater weight than usage of trade;
>
>     (c) specific terms and exact terms are given greater weight than general language;
>
>     (d) separately negotiated or added terms are given greater weight than standardized terms or other terms not separately negotiated.

(Emphasis added.)  The rule applies only "generally."  As noted in Comment b to this *Restatement* section, "[s]ince an agreement is interpreted as a whole, it is assumed in the first instance that no part of it is superfluous," but  "[e]ven agreements tailored to particular transactions sometimes include overlapping

or redundant or meaningless provisions." Even if the validity phrase would be a redundancy when "the Lintons" is read as meaning the Lintons as debtors in possession (because the validity phrase would state a result flowing from the Lintons' agreement as debtors in possession not to challenge the lien), that would be insufficient to override the natural interpretation of the agreement as referring consistently throughout to "the Lintons" as debtors in possession. Stating that the lien would retain its validity and priority as of the date of commencement of the case merely spells out a consequence of the agreement of the debtors in possession not to challenge the lien so that the consequence was not left in doubt. For example, not only could the lien not be avoided as a preference, it could not be avoided as a fraudulent transfer. This is an instance of stating a specific outcome instead of stating a general outcome, with the specific controlling if there was any doubt as to whether the bar against challenging the lien did not encompass letting Chesapeake enjoy whatever it was entitled to enforce under the lien pursuant to nonbankruptcy law. As the *Restatement (Second) of Contracts* § 203(c) (1981) makes clear, the specific statement would control if there were any doubt under the general provision that Chesapeake would continue to enjoy the rights it had as of the petition date. The interpretation of "the Lintons" as encompassing the Lintons in their role as debtors in possession,

12

and thus barring them in that role from challenging the lien on
any ground (which would include barring them from seeking to
avoid the lien as invalid on the petition date), does not deprive
the validity phrase of meaning.  Emphasizing a specific outcome
of a prohibition (instead of only making a general statement of
the prohibition) does not deprive a provision of meaning:
emphasizing a specific consequence of a general provision is
often important to a party.

Moreover, another reason exists why the validity phrase is
not superfluous when the term "the Lintons" is interpreted as
including reference to the Lintons as debtors in possession.  The
validity phrase can be read as stating that although on behalf of
the bankruptcy estate, no challenge would be made to the lien,
nevertheless in any proceeding to enforce the lien, the validity
could be challenged by any other party to the enforcement
proceeding.  If the trustee is correct that the lien on Citibank
is jurisdictionally defective, then Citibank (or a creditor who
served a later writ of garnishment on Citibank) would be entitled
belatedly to raise that jurisdictional defect.  In other words,
the validity phrase clarifies that the Lintons' agreement *as
debtors in possession* not to challenge the lien would not serve
to validate the lien (if there was any defect in the lien) as
against the garnishee (or as against any other entities holding
liens against the garnished accounts).  Thus, the validity phrase

13

would have meaning and not be redundant even if the Lintons in
their role as debtors in possession were agreeing not to
challenge the lien.  Accordingly, the trustee's argument is
unpersuasive and does not establish a basis for rejecting the
only otherwise reasonable interpretation of the phrase "the
Lintons" as including, consistently throughout the contract, the
Lintons in their role of debtors in possession.

The trustee submitted the Affidavit of David Lynn, attorney
for the Lintons at the time the Stipulation and Order was drafted
and issued, to prove that the language was selected to permit a
trustee to later challenge the validity of the lien.  Chesapeake
correctly argues that this affidavit should not be considered.
Extrinsic evidence is not considered in interpreting contract
language unless that language is ambiguous.  *See, e.g.,*
*Republican Nat. Committee v. Taylor*, 299 F.3d 887, 891-92 (D.C.
Cir. 2002) (citing *Dodek v. CF 16 Corp.*, 537 A.2d 1086, 1092
(D.C. 1988)).  A contract is ambiguous only if it is "reasonably
susceptible of different constructions or interpretations." *1901*
*Wyoming Ave. Co-Op Ass'n v. Lee*, 345 A.2d 456, 461 n. 7 (D.C.
1975).  Here, based upon the nature and language of the section
referring to the bank's lien, the phrase "the Lintons" refers to
their role as debtors in possession; the language is not
reasonably susceptible to different interpretations and thus is
not ambiguous.  *See id.; Washington Props., Inc. v. Chin, Inc.,*

14

760 A.2d 546, 548 (D.C. 2000) ("A contract is not ambiguous

merely because the parties dispute its meaning, nor is it

ambiguous merely because its terms are complex or 'could have

been clearer.'")

Nevertheless, written terms arguably ought to be construed

according to the meaning ascribed to them in the course of the

parties' conduct and negotiations:

> In considering whether a contract is ambiguous, we
> examine the document on its face, giving the language
> used therein its plain meaning. [*Sacks v. Rothberg,* 569
> A.2d 150, 154 (D.C. 1990)] (citing *Kass v. William
> Norwitz Co.*, 509 F. Supp. 618, 625 (D.D.C. 1980)); *1010
> Potomac Assocs. v. Grocery Mfrs. of Am., Inc.*, 485 A.2d
> 199, 205 (D.C. 1984) (citing *Bolling Fed. Credit Union
> v. Cumis Ins. Soc'y, Inc.*, 475 A.2d 382, 385 (D.C.
> 1984)). "Extrinsic evidence of the parties' subjective
> intent may be resorted to only if the [contract] is
> ambiguous." *Id.* at 205-06. However, "[t]he endeavor to
> ascertain what a reasonable person in the position of
> the parties would have thought the words of a contract
> meant applies whether the language is ambiguous or
> not." *Sagalyn v. Foundation for Pres. of Historic
> Georgetown*, 691 A.2d 107, 112 n. 8 (D.C. 1997) (citing
> *1010 Potomac Assocs.*, 485 A.2d at 205-06). In this
> context, a reasonable person is: (1) presumed to know
> all the circumstances surrounding the contract's
> making; and (2) bound by usages of the terms which
> either party knows or has reason to know. *Intercounty
> Constr. Corp. v. District of Columbia*, 443 A.2d 29, 32
> (D.C. 1982) (citations omitted). "[T]he reasonable
> person standard is applied both to the circumstances
> surrounding the contract and the course of conduct of
> the parties under the contract." *Id.* (citing *1901
> Wyoming Ave. Coop. Ass'n v. Lee*, 345 A.2d 456, 461-62
> (D.C. 1975)).

*Akassy v. William Penn Apts. Ltd. Partnership*, 891 A.2d 291, 299

(D.C. 2006). *But see Capital City Mortg. Corp. v. Habana Village

Art & Forklore, Inc.*, 747 A.2d 564, 567 (D.C. 2000) (stating that

only if the face of the contract itself raises an ambiguity does

a court resort to extrinsic evidence, and stating that extrinsic

evidence includes "the circumstances before and contemporaneous

with the making of the contract . . ." *id. at* 567 n.2 (quoting

*1901 Wyoming Ave. Coop. Ass'n*, 345 A.2d at 461-62)).  I will not

attempt to reconcile the seeming conflict in District of Columbia

case law, and will assume that the more recent decision, *Akassy*,

is the correct statement of law.

But here, the trustee has offered no evidence of the

circumstances surrounding the making of the contract and the

course of conduct of the parties from which it could be

ascertained that a reasonable person in the position of the

parties would have thought the words "the Lintons" in the

agreement meant the Lintons as individuals, and not as debtors in

possession.  Lynn's affidavit does not state that he communicated

to Chesapeake the Lintons' intention that the Lintons were

agreeing only as individuals (and not as debtors in possession)

to refrain from challenging Chesapeake's lien.  It is only his

view of what was intended, and that does not suffice to establish

an ambiguity in the written contract.  As observed in *Clyburn v.

1411 K Street Ltd. Partnership*, 628 A.2d 1015, 1017 (D.C. 1993):

> Disagreement between the parties as to the meaning of a
> contract does not, ipso facto, render it ambiguous.
> *Sacks v. Rothberg*, 569 A.2d 150, 154-55 (D.C. 1990).
> "The court may not create ambiguity where none exits."
> *Carey Canada, Inc. v. Columbia Cas. Co.*, 291
> U.S.App.D.C. 284, 292, 940 F.2d 1548, 1556 (1991).

16

What Lynn subjectively thought is irrelevant; it is not a surrounding circumstance or a course of conduct, of which both parties were aware, that would have led the parties reasonably to conclude that the term "the Lintons" was meant to refer to the Lintons only individually and not as debtors in possession.

In other words, in construing the contract, the court must engage in an objective interpretation of the parties' intention based on what was manifested to both of them by their course of conduct and the written agreement. "[I]ntent is properly an objective, not subjective, issue." *Dodek v. CF 16 Corp.*, 537 A.2d 1086, 1093 (D.C. 1988) (citation omitted). Here, Lynn's affidavit is irrelevant because his affidavit does not state that he communicated his intention to Chesapeake, and instead recites only his subjective intention.

The trustee has proffered no admissible extrinsic evidence of the parties' intention. Accordingly, the court is limited to interpreting the agreement based on the text. Because the text itself is unambiguous, its interpretation is a question of law. *See 1010 Potomac Assocs. v. Grocery Manufacturers of America, Inc.*, 485 A.2d 199, 205 n.6 (D.C. 1984). The only reasonable interpretation of the contract is that it used the term "the Lintons" to refer to the Lintons in their role as debtors in possession. Accordingly, Chesapeake is entitled to summary judgment based upon a contract of the debtors in possession that

17

bars the trustee, as successor to the debtors in possession, from challenging the lien.  Recognizing, however, that this was a close question, I will address the other grounds upon which Chesapeake relied in seeking dismissal.

B

Res Judicata

The June 11, 2008 Stipulation and Order dismissed with prejudice the complaints of the debtors in possession; these complaints sought to avoid the liens.  Based upon this dismissal, Chesapeake argues the trustee is barred on grounds of res judicata from challenging the liens because the Lintons dismissed their action challenging the liens with prejudice.

The doctrine of res judicata encompasses issue preclusion and claim preclusion.  *See Taylor v. Sturgell*, --- U.S. ----, 128 S.Ct. 2161, 2171 (2008); *I.A.M. Nat. Pension Fund, Ben. Plan A v. Indus. Gear Mfg. Co.*, 723 F.2d 944, 946-47 (D.C. Cir. 1983).  Issue preclusion prevents a party from re-litigating an issue of law or fact that has already actually been decided by a court of valid jurisdiction, whereas claim preclusion prevents re-litigation of the same claim, regardless of whether that re-litigation would raise the same issues.  *Id.*  As such, claim preclusion prevents litigation of issues of fact or law which should have been raised in previous litigation, even when they were not raised.  *See, e.g., Capitol Hill Group v. Pillsbury*

18

*Winthrop Shaw Pittman, LLP* ("*CHG*"), 574 F. Supp. 2d 143, 148
(D.D.C. 2008).  "[P]reclud[ing] parties from contesting matters
that they have had a full and fair opportunity to litigate
protects their adversaries from the expense and vexation
attending multiple lawsuits, conserves judicial resources, and
fosters reliance on judicial action by minimizing the possibility
of inconsistent decisions."  *Montana v. United States*, 440 U.S.
147, 153-54 (1979).

     The four elements considered in a motion for claim
preclusion are: (1) an identity of parties; (2) a judgment from a
court of competent jurisdiction; (3) a final judgment on the
merits; and (4) an identity of the cause of action.  *CHG*, 574 F.
Supp. 2d at 148.  In relation to the fourth element, the claims
need not be identical for res judicata to apply.  *Id.* at 149.
"In some instances, the court in determining the identity of two
causes of action will examine whether the facts in the two cases
are the same.  In other instances, the court will examine whether
the primary right asserted in the two cases is the same." *Indus.
Gear*, 723 F.2d at 948 (citing *Nash County Bd. of Ed. v. Biltmore
Co.*, 640 F.2d 484, 487-488 (4th Cir. 1981)).  In this analysis, a
court must make a pragmatic determination whether the claims are
based upon the same nucleus of facts, weighing whether the claims
are related in time, space, origin, or motivation; whether they
form a convenient trial unit; and, whether their treatment as a

19

unit conforms to parties' expectations or business understanding
or usage.  *See CHG*, 574 F. Supp. 2d at 149 (citations omitted).
The focus is on "the facts surrounding the transaction or
occurrence which operate to constitute the cause of action, not
the legal theory upon which a litigant relies." *Page v. United
States*, 729 F.2d 818, 820 (D.C. Cir. 1984).

Here, on February 27, 2008, the debtors in possession, as
part of their Chapter 11 reorganization, filed complaints seeking
avoidance of the garnishment executed by Chesapeake because it
was executed within 90 days before the filing of the bankruptcy
petition, and because continuation of the garnishment violated
the bankruptcy's automatic stay.  (*See* Adv. Proc. Nos. 08-10003;
08-10004.)  As part of the June 11, 2008 Stipulation and Order,
the debtors in possession dismissed those adversary proceedings
with prejudice.  (Case No. 08-10032, DE No. 6, Exhibit 3, p. 4.)
After the bankruptcy estate was converted to a Chapter 7
liquidation, the trustee filed his complaint seeking to avoid the
garnishment lien, arguing inadequate service on Citibank of the
writ of garnishment.

In addressing the four elements of claim preclusion, the
first three elements have been resolved or are undisputed.  In
relation to the first, although the trustee challenged whether it
was properly a successor in interest to the debtors in
possession, this court has already determined that the trustee is

a successor in interest of the previous litigation. *See In re Linton Properties, LLC*, --- B.R. ----, 2009 WL 113460 (Bankr. D.D.C. January 16, 2009) (citing *Armstrong v. Norwest Bank, Minneapolis, N.A.*, 964 F.2d 797, 801 (8th Cir. 1992).   In relation to the second and third elements, neither party has disputed that this is a court of competent jurisdiction, or that the dismissal with prejudice was a final judgment on the merits.

In relation to the fourth element, the facts in this case present a close issue, but ultimately the claims do not share the same nucleus of facts for the purpose of res judicata. Chesapeake is correct that both actions require analysis of the same documents (*i.e.*, the writs of garnishment and the affidavits of service).   However, simply because two claims arise from the same documents does not, in itself, mean that both claims must be brought in the same suit.   *See Indus. Gear*, 723 F.2d at 948; *see also, U.S. Indus., Inc. v. Blake Const. Co., Inc.*, 765 F.2d 195, 205 n.21 (D.C. Cir. 1985) ("The fact that two claims arise under the same contract is only one of the factors to be considered; standing alone, of course, it will not always be sufficient to establish a single cause of action.")   Here, although the causes of action require analysis of the same documents, each action requires consideration of different information in those documents.   In the prior preference and stay action, the documents were needed to provide the date upon which they were

21

served in relation to the bankruptcy filing.  In the present action, the filing date is immaterial, but the entity upon whom service was made in an attempt to serve the garnishee, and whether that service invalidates the writ, goes to the crux of the trustee's claim.  The factual inquiries of the two claims are distinct; the claims do not form a convenient trial unit such that the claims should have been brought together.  *Cf. CHG*, 574 F. Supp. 2d at 149 (the court held res judicata was applicable where both actions relied on the same documents *and* involved the same analysis); *In re Silver Mill Frozen Foods, Inc.*, 32 B.R. 783, 786-87 (Bankr. Mich. 1983) (in discussing a related standard of res judicata, the court held the second suit was not barred where the facts necessary to sustain the first action could not sustain the second.)

Furthermore, the legal bases and underlying purpose for the claims are distinct.  Suits may be identical for the purpose of res judicata even if they are based on two different statutes "when the two statutes afford the same right or interdict the same wrong."  *Nash County Bd. of Ed. v. Biltmore Co.*, 640 F.2d 484, 488-489 (4th Cir. 1981).  Here, the prior preference and stay action was based upon bankruptcy law, which prevents a creditor from securing assets of the estate at the unfair detriment of other creditors.  The current action is based upon Maryland law, which works to insure the proper service of

22

garnishees and the presence of jurisdiction over those involved.[5]
These claims are based upon different laws which pursue or
protect different interests or rights.  Although success on
either claim would lead to avoidance of the lien, the legal
inquiries are distinct; the claims do not form a convenient trial
unit.  *See CHG*, 574 F. Supp. 2d at 149; *Silver Mill*, 32 B.R. at
787 (recognizing a lack of identity among causes of action when
they did not share the same right of the plaintiff which was
wronged by the defendant.); *see also, Sheng v. Nintendo of
America, Inc.*, 114 F.3d 1195 (Table) (9th Cir. 1997) (under a
related res judicata standard, the court held that a copyright
and trademark infringement suit, which would have removed a lien,
did not bar a subsequent preference action which would have
avoided the same lien, because the claims were based on different
laws and the second suit required consideration of some facts not
required in the first suit, even though the court found that the
two suits arose from the same nucleus of facts.)

---

[5] Chesapeake characterizes the actions as having the same
motivation, because both actions seek to avoid the lien.
Although both actions have the same general motivation,
motivation is only one factor in the res judicata identity
analysis; motivational similarities here are outweighed by the
differences in the analysis, nature, and interests underlying the
two actions.  *See A.I. Credit Corp. v. Drabkin (In re Auto-Train
Corp.)*, 49 B.R. 605, 608, 613 (D.D.C. 1985), *aff'd* 800 F.2d 1153
(D.C. Cir. 1986) (where the validity challenge based on state law
did not preclude a later preference action).

23

Neither party provided case law addressing the nature of the specific claims here - i.e. a preference and violation-of-stay action and a challenge of the validity of the underlying interest. In *A.I. Credit Corp. v. Drabkin (In re Auto-Train Corp.)*, the United States District Court for the District of Columbia upheld the bankruptcy court's ruling that a suit challenging the validity of a security interest did not bar the filing of a preference action related to payments made on that security. 49 B.R. 605, 613 (D.D.C. 1985), *aff'd* 800 F.2d 1153 (D.C. Cir. 1986). In applying the res judicata test set forth above, the District Court differentiated the two causes of action because they did not form a convenient trial unit where (1) the subject matter and nature of the relief sought were dissimilar; (2) the preference action required a thorough analysis of the nature of the transfers, value of the collateral, and evaluation of the claims of competing creditors, while the validity action was a straightforward question; and, (3) the trustee was forced to challenge the validity quickly in order to protect his right to do so, while the Bankruptcy Code provides a more complete proceeding for preference actions. *Id.* Here, the preference action preceded the validity challenge. However, many of the same considerations exist here. First, the claims are based upon distinct factual and legal subject matter. Second, whereas the preference action was straightforward and raised early in the

24

Chapter 11 reorganization in a pressed effort to free up funds
for that reorganization, the validity challenge is a more
complicated matter of state law and is being raised during the
Chapter 7 liquidation, when the trustee has more time to fully
explore available claims.  These factors indicate the claims do
not form a convenient trial unit.  *See id.*[6]

Chesapeake further argues that the validity challenge being
brought at the same time as the preference action "would have
conformed to the parties' expectations and preserved judicial
resources." (DE No. 17, p. 5) (emphasis removed).  With respect
to parties' expectations, there is no evidence that the parties
expected that the dismissal with prejudice of the preference
action would itself preclude the pursuit of a challenge to the
validity of the lien.  (It is a much closer question, discussed
previously, whether other language in the Stipulation and Order
was intended *contractually* to bar pursuit of a challenge to the

---

[6]  The situation here is different from one where, in ruling
on the initial action, the court makes a determination as to
validity, so that the issue is resolved and res judicata
precludes further litigation.  *See In re Asheboro Precision
Plastics, Inc.*, 2005 WL 1287743, *6 n.4 (Bankr. M.D.N.C. March 1,
2005) ("[I]f the issue of the validity of a lien is actually
litigated by consent of the parties and the court within the
context of a motion to lift the automatic stay then an
adjudication on the merits might be res judicata in subsequent
litigation."); *see also In re Midway Airlines, Inc.*, 167 B.R.
880, 883 (Bankr. N.D. Ill. 1994) (res judicata does not bar a
validity challenge based upon a previous hearing on a motion to
lift the automatic stay).  Here, as previously discussed, the
validity of the lien was not addressed by the court, nor did the
parties resolve the issue in the Stipulation and Order.

validity of the lien.)  With respect to the preservation of judicial resources, the two claims rest on different facts and law; hearing the two claims together would still require a full review of both sets of facts and law.  Although Chesapeake might have preferred to resolve any disputes concerning the lien in one suit, res judicata does not bar a validity challenge under these facts.

C

Service Issue

The trustee seeks to avoid the lien, arguing the writs of garnishment were not properly served on Citibank, and thus personal jurisdiction was never established.  The trustee argues service was inadequate because (1) Chesapeake did not first attempt to serve the resident agent, president, secretary, or treasurer, pursuant to Maryland Rule 2-124(d); (2) the writ was not sent by certified mail, pursuant to Maryland Rule 2-121(a)(3); and (3) the writ was not sent restricted delivery, pursuant to Maryland Rule 2-121(a)(3).  (*Id.*)[7]

---

[7]  The trustee also asserts that the service, made to a Texas address, does not meet the requirements of the "Texas Rules of Practice," pursuant to Maryland Rule 2-121(a) ("Service outside of the State may also be made in the manner prescribed by the court or prescribed by the foreign jurisdiction if reasonably calculated to give actual notice.").  (Complaint, p. 6.)  The trustee does not cite to which specific provisions of the Texas Civil Practice and Remedies Code or other Texas statute it refers.  (*See id.*)  However, because Chesapeake's service under the Maryland Rules was sufficient for jurisdictional purposes, arguments relating to Texas requirements are moot.

The relevant facts and law are as follows.  Maryland Rule 2-124(d) reads:

> Service is made upon a corporation, incorporated association, or joint stock company by serving its resident agent, president, secretary, or treasurer. If the corporation, incorporated association, or joint stock company has no resident agent or if a good faith attempt to serve the resident agent, president, secretary, or treasurer has failed, service may be made by serving the manager, any director, vice president, assistant secretary, assistant treasurer, or other person expressly or impliedly authorized to receive service of process.

Maryland Rule 2-121(a) reads:

> Service of process may be made within this State or, when authorized by the law of this State, outside of this State . . . (3) by mailing to the person to be served a copy of the summons, complaint, and all other papers filed with it by certified mail requesting: "Restricted Delivery--show to whom, date, address of delivery." Service by certified mail under this Rule is complete upon delivery.

Instead of serving, or attempting to serve, the resident agent, president, secretary, or treasurer of Citibank via certified mail with restricted delivery, Chesapeake contacted Citibank and Citibank agreed to service at the Citibank Service Center in San Antonio, Texas via overnight mail.  Chesapeake served Citibank in that manner.  Citibank filed an answer to the writ which did not raise any challenges to the service of the writ.

Here, the parties do not dispute that the service afforded Citibank deviated from the service method set forth in the Maryland Rules - because service was not made first on Citibank's resident agent, president, secretary, or treasurer, pursuant to

Rule 2-124(d), and service was not sent certified mail and restricted delivery, pursuant to Rule 2-121(a)(3).  "It is an elementary principle that no valid proceeding can be had against a person until he has been notified of the proceeding by proper summons, **unless he voluntarily waives such constitutional right.**" *Harvey v. Slacum*, 29 A.2d 276, 278 (Md. 1942) (emphasis added); *accord*, *Lohman v. Lohman*, 626 A.2d 384, 392 (Md. 1993) (defective service, unless waived, is a jurisdictional defect, and that defect is not cured by actual knowledge of the proceedings).

Of relevance here are two of the ways under Maryland law for a party to waive service of process in conformance with the Maryland Rules.  First, a party is free to waive the right to insist on such service by agreeing in advance to a different method of service:

> a corporation may assign the task of accepting process and may establish procedures for insuring that the papers are directed to those ultimately responsible for defending its interests.  A process server may, of course, always serve the corporate personnel specifically identified in the statute.  The corporation however cannot escape the consequences of establishing alternative procedures which it may prefer.  In such a case the process server cannot be expected to know the corporation's internal practices.  Reliance may be based on the corporate employees to identify the proper person to accept service. In such circumstances, if service is made in a manner which, objectively viewed, is calculated to give the corporation fair notice, the service should be sustained.

*Academy of Irm v. LVI Env. Servs. Inc.*, 687 A.2d 669, 675-76 (Md.

1997)[8] (citing *Fashion Page, Ltd. v. Zurich Ins. Co.*, 406 N.E.2d
747, 749 (N.Y. 1980)).  Second, even absent an agreement to the
alternative method of service, a party is free to waive the right
to assert the defense of improper service by not raising it in
its answer.  *See, e.g., Williams v. Williams*, 501 A.2d 432, 435
(Md. 1985) (defense as to form of process waived by failure to
plead the defense).

Maryland law does not alter these rules in the case of
garnishments.  In *First Nat. Bank v. Equitable Life Assur. Soc.
of U.S.*, 145 A. 779, 780 (Md. 1929), the court recognized that by
pleading without alleging lack of proper service, a garnishee had
"waived any defects of service or summons." (Citations omitted.)
The court in *First National Bank* recognized that the garnishee,
by having pled, had not waived its right to file a motion to
quash; however, the defense raised by the garnishee addressed by
the Court of Appeals was based upon the death of one of the

---

[8]  The trustee argues *Academy of Irm* only stands for the
proposition that where an authorized agent signs for restricted-
delivery mail on behalf of an executive of a large organization,
rather than the executive personally receiving and signing for
that mail, service is proper under Maryland Rule 2-124(d).  (DE
No. 15, pp. 12-13.)  The trustee correctly states the narrow
holding of *Academy of Irm*.  However, that holding rests on a
rationale found in case law discussed and favorably cited by the
Court of Appeals that supports a much broader flexibility
concerning service on large organizations, and supports the
manner of service agreed to here.  *See* 687 A.2d at 675-76.  Even
assuming (without deciding) that the rationale was not a part of
the holding, the trustee fails to articulate a reason why the
Court of Appeals would deviate from that rationale in the
circumstances of this case.

29

judgment-debtors, not on a defect in service of the writ.  145 A. at 780.

The principle established by *First National Bank* that a garnishee may waive a defect in the service of the writ is confirmed as well by *Cromwell v. Royal Canadian Ins. Co.*, 49 Md. 366, 1878 WL 4705 (1878), and *Thompson v. Central Metal & Supply Co.*, 148 A. 231, 232 (Md. 1930), which stand for the broader principle that a garnishee (like a litigant in other litigation) may waive a procedural requirement designed for the garnishee's protection, and not for the protection of another party or intended to limit the class of cases a court may hear.  In *Cromwell,* the garnishee neither resided in nor did business in Maryland, and as the garnishment statute was written, this deprived the court of subject matter jurisdiction.  The court distinguished between statutory provisions going to jurisdiction over the person versus jurisdiction over the subject matter, and held that the statutory limitations there involved the class of garnishment suits that the Maryland courts could then hear, and constituted "not a grant of a *privilege* or *immunity* from suit, to parties otherwise liable to be sued in the courts of the State, and subject to their jurisdiction, but the grant of a *restricted* and *limited* jurisdiction to the courts themselves over *certain suits* against foreign corporations not otherwise compelled to submit to the jurisdiction of any court of the State."  *Id.*, 1878

WL 4705, at *5 (italics in original).  Accordingly, the
garnishee's answer was ineffective to waive the defect as it went
to subject matter jurisdiction.  The Court of Appeals
distinguished that circumstance from provisions that constitute a
"privilege or exemption" of the party served "which a party
cannot avail himself of after the time allowed for dilatory
pleas."  *Id.* (*citing Ockerme v. Gittings*, 35 Md. 169 (1872)
(statutory provision that no person shall be sued out of the
county of his residence waived by failure to plead)).  That
latter passage in *Cromwell* was applied in *Thompson* to bar
invocation of such a "privilege or exemption" of the party served
in a garnishment proceeding when not timely pled.  *See Thompson*,
148 A. at 232.

The Maryland Rules regarding service of a writ of
garnishment on the garnishee are designed for the protection of
the garnishee, not as a restriction on the category of cases the
court may hear, or for protection of the judgment debtor.
Accordingly, Citibank was free to waive the defense of lack of
proper service.

Despite *First National Bank*, *Cromwell,* and *Thompson*, the
trustee argues that *Cole v. Randall Park Holding Co.,* 95 A.2d 273
(Md. 1953), announces a rule under which a garnishee may not
waive a defect in service of the writ.  The court in *Cole* stated
that:

31

> Maryland early chose to follow a rule to which it has
> steadily adhered that pleading by a garnishee in an
> attachment does not necessarily nor always amount to a
> manifestation of consent to jurisdiction, and that a
> motion to quash on fundamental or jurisdictional
> grounds can be filed either by the garnishee or by the
> defendant, after pleas by the garnishee. [Citing, among
> other decisions, *Cromwell* and *First National Bank*.]

*Cole*, 95 A.2d at 278.[9]  But like *Cromwell*, *Cole* is illustrative
that waiver is unavailable when the service requirement deals
with a limit on the class of garnishment cases the court may
hear.  In *Cole*, as in *Cromwell*, the garnishee neither resided in
nor did business in Maryland; the court held that the garnishee
was not subject to suit in Maryland.  *Id.* at 279.  Therefore, the
debtor was permitted to challenge the service of the garnishee on
the grounds that the court lacked jurisdiction over the
garnishee.  *Id.* at 279-80.  Here, there is no dispute that
Citibank has a presence in Maryland, and that the Maryland court

---

[9]    The other Maryland decisions upon which the trustee
relies are distinguishable because the garnishee did not waive
the jurisdictional defense of lack of proper service.  *See Sheehy
v. Sheehy*, 242 A.2d 153, 155-56 (Md. 1968) (a deputy sheriff
rendered service by going to the wrong street address and wrong
apartment number; asking if the person was "Mr. Sheehy" without
verifying the first name; and, when the unidentified voice
answered "yes" without opening the apartment door, the deputy
sheriff read the subpoena and left a copy outside the door);
*Gordon, Feinblatt, Rothman, Hoffberger & Hollander v. Gerhold*,
600 A.2d 1194, 1203 (Md. Ct. Spec. App. 1992) (secretary was not
authorized to accept service on the garnishee's behalf); *Guen v.
Guen*, 381 A.2d 721, 723, 726 (Md. Ct. Spec. App. 1978) (no real
evidence of the service and the return of service was not signed
by the individual); *Brown v. American Insts. for Research*, 487 F.
Supp. 2d 613, 614 (D. Md. 2007) (each attempt at service was
invalid based upon various shortcomings).

could exercise subject matter jurisdiction over the writ against Citibank.

The court in *Cole* gave no suggestion that it was attempting to overrule *First National Bank* and *Cromwell* and, moreover, proceeded to discuss those decisions at length as supporting its view. *See* 95 A.2d at 280. Its holding, limited to the issue of a foreign corporation being sued in Maryland (a question, as it emphasized, *see id.* at 279, of subject matter jurisdiction over the *res*), did not deal with the issue of a garnishee's waiving the requirement of service in the manner specified by the Maryland Rules (a question of jurisdiction over the person). The trustee has pointed to no decision suggesting that the manner of service specified by the Maryland Rules for making service on Citibank could be viewed as not a "privilege or exemption" (as discussed in *Cromwell*) of Citibank that Citibank could therefore waive.[10] Accordingly, unless the trustee has raised a genuine dispute as to the facts upon which Chesapeake relies, Citibank waived the defense of lack of service as specified by the Maryland Rules both (1) by agreeing in advance to the manner of service of Chesapeake's writ, and (2) by filing an answer that

---

[10] The trustee does not contend that the Lintons were not themselves served with process in the garnishment proceeding in accordance with the Maryland Rules, and thus we are not dealing with Citibank's answer as being ineffective to eliminate any defect in service on the Lintons as impacting the validity of Chesapeake's liens.

33

did not raise any defense regarding service.

The facts are not in genuine dispute.  As to the first basis
for finding a waiver, the trustee argues that "[o]n the record
before this Court, [Chesapeake]'s *unsupported* assertion that PNC
and Citibank consented to service that did not comply with the
Maryland Rules is insufficient to support its motion to dismiss
or in the alternative to grant summary judgment in its favor."
(DE No. 15, p. 13) (emphasis added).  However, the trustee
conceded in response to Chesapeake's statement of material facts
not in genuine dispute that Citibank "agreed to the manner of
service" of the writ on it, and as noted in the complaint, the
affidavit of service of the writ stated that the writ was sent to
Citibank via "overnight mail with Garnishee's permission" at the
San Antonio address.  The trustee seems only to be saying that
Chesapeake did not file an affidavit from the Citibank
representative who was contacted to prove consent was given, but
that does not suffice to disprove Chesapeake's own proof (the
return of service) that consent was given.  Moreover, "a proper
return is prima facie evidence of valid service of process and a
simple denial of service by the defendant is not sufficient to
rebut the presumption arising from such a return."  *Sheehy v.
Sheey*, 242 A.2d 153, 155 (Md. 1968) (citation omitted).  The
trustee has provided no factual grounds to challenge the
existence of consent; his assertion raises no genuine issue of

fact.  *See Liberty Lobby*, 477 U.S. at 256 (the nonmoving party
may not rest on mere allegations or denials, but must instead
demonstrate the existence of specific facts that create a genuine
issue for trial.)

As to the second basis for finding waiver, the trustee does
not dispute that Citibank answered the writ without raising a
defense of improper service.  Accordingly, both grounds of waiver
are supported by the facts.

Based on both an affirmative consent to the mode of service
and the failure to raise a defect in service in its answer to the
writ, Citibank waived any defense of lack of service as
prescribed by the Maryland Rules.  The trustee as a hypothetical
judgment lien creditor under 11 U.S.C. § 544, executing on
Citibank on the petition date, would have been confronted with a
prior writ on Citibank as to which Citibank had already waived
the defect in service.  The lack of service as specified by the
Maryland Rules no longer being an issue, as of the petition date,
affecting the validity and effectiveness of Chesapeake's
garnishment lien against the Citibank accounts, the trustee as a
hypothetical judgment lien creditor could not defeat Chesapeake's
lien.  *See Pennsylvania Capital Bank v. Glosser (In re Allen)*,
228 B.R. 115, 128-29 (Bankr. W.D. Pa. 1998) (holding, in a
trustee's avoidance action, that garnishment lien became
perfected, despite improper service, on the date that the

35

garnishee waived the defense of improper service).

IV

Conclusion

Based upon the preceding analysis, a judgment will follow, granting Chesapeake's motion to dismiss as it pertains to a contractual bar and, in the alternative, its motion for summary judgment as it pertains to the sufficiency of service of the writ of garnishment.

[Signed and dated above.]

Copies to:

All parties and counsel of record; Office of United States Trustee.